UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RONALD D. FRANS,

              Plaintiff,                          Case No. 2:18-cv-00004

v.                                        HON. PAUL L. MALONEY

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

_____/

## REPORT AND RECOMMENDATION

       Plaintiff Ronald D. Frans filed an application for disability and disability insurance benefits on July 24, 2009, alleging an April 1, 2008 disability date.   (ECF No. 7-11, PageID.687-693). Plaintiff's claim was remanded to an Administrative Law Judge (ALJ) by the Appeals Council on two occasions and remanded by this Court upon stipulation of the parties on June 29, 2016. (Case No. 2:16-cv-40).   Plaintiff alleges disability due to degenerative disc disease, fibromyalgia or chronic pain syndrome, gastroesophageal reflux disease, hypertension, hepatitis C, sarcoidosis, and anxiety.   Plaintiff had hearings before an ALJ on March 17, 2011 (ECF No. 7-2, PageID.81-115), June 11, 2013  (PageID.116-148), May 7, 2015  (PageID.149-170), and February 21, 2017 (PageID.204-266).  The May 7, 2015, and February 21, 2017, hearings were held before Administrative Law Judge (ALJ) Margaret J. O'Grady.

       During the May 7, 2015 hearing, Plaintiff testified that he was born on February 24, 1970, and that he lives by himself.  (PageID.152).   Plaintiff has a 9th grade education. *Id*. Plaintiff stated that he has a difficult time reading and has been diagnosed with dyslexia.  Plaintiff

lost his driver's license for driving while intoxicated.  (PageID.153).  Plaintiff has three drunk driving convictions and spent a year in jail.  *Id.*  Plaintiff attempted to gain disability benefits after he was released from jail.  (PageID.154).  Plaintiff was working as a millwright until his back gave out.  (PageID.155).  Plaintiff stopped working before his incarceration.  *Id.*

Plaintiff was taking medications including Zantac, Prilosec, Carafate, Simvastatin, Flexeril, Neurontin, and Norco.  (PageID.156).  Plaintiff takes Norco for his constant lower mid back pain.  *Id.*  Plaintiff has neck pain due to a previous break and suffers with chronic arthritis. (PageID.157).  Plaintiff's hands go numb when he tries to sleep.  (PageID.157-158).   Plaintiff spends his day sitting in a recliner and walking around his house.  Plaintiff can bathe and shower, cook, do his laundry, watch television, and grocery shop.  (PageID.158-159).  Plaintiff's sister does his dishes and house cleaning.  *Id.*  Plaintiff socializes weekly with a friend.  (PageID.159). Plaintiff is not being treated for any psychiatric or mental health issues and is only taking medication for pain.  (PageID.160).  Plaintiff stated that he can walk about a block and a half, to two blocks before he needs to stop and rest.  (PageID.162).  When he is a passenger in a vehicle, he needs to stop every 45 minutes to stretch.  Plaintiff states that he has some memory problems and is constantly in pain.  (PageID.162-164).

ALJ O'Grady concluded that Plaintiff was not disabled in a decision dated July 23, 2015.  On appeal, this Court remanded the matter under sentence four of section 205(g).  The Appeals Council remanded the matter to the ALJ with directions to update the medical record, obtain medical expert opinion, assess residual functional capacity, and conduct a new hearing and issue a new decision.

At the February 21, 2017 hearing, Plaintiff, Pauline Frans, medical expert Albert Oguejiofor, and vocational expert Joseph Entwistle testified.  Plaintiff was represented by counsel.

2

Plaintiff testified that he had not worked since the last hearing.  (ECF No. 7-3, PageID.207-208). Plaintiff never received psychiatric treatment.  (PageID.208).  Plaintiff takes Norco, Flexeril, Gabapentin, Zantac, Simvastatin, Carafate, and Prilosec.  *Id*.  Plaintiff has constant shoulder and neck pain and daily tingling in his arms and legs that comes and goes.  *Id*.  Plaintiff takes Carafate for sarcoidosis.  (PageID.209).  Plaintiff takes Neurontin for his hand issues and pain medications for pain.  (PageID.210).  Plaintiff stated that he "can't hardly read and write."  *Id*.  Plaintiff broke his neck in a car accident and could no longer work. (PageID.211).

Plaintiff indicated that at the last hearing he testified that he could walk about two blocks before he would start to have problems, but he believes that it is now worse.  (PageID.211). Plaintiff had surgery since the prior hearing, but he did not notice much improvement.  *Id*.  Due to pain, Plaintiff frequently moves from a chair to the couch, and walks around a little before sitting back down.  (PageID.212).  Plaintiff stated he was able to sit for about two hours before needing to get up and move around due to tingling in his legs. Plaintiff can stand for about 45 minutes before his back starts hurting. *Id*.  Plaintiff explained that his insurance would not cover physical therapy and he could not pay for it.  (PageID.213).  Carpel tunnel surgery was performed on his right hand, but that did not correct the issues.  *Id*.

Plaintiff experiences more neck pain on some days.  On some occasions, Plaintiff can "hardly turn it at all."  *Id*.  Plaintiff gets migraines from his neck pain once or twice per week. *Id*.  Plaintiff states that he coughs-up blood each day and that eating spicier food makes this condition worse.  (PageID.214). Plaintiff does not try to lift more than twenty pounds. (PageID.215).  Plaintiff rates his back and neck pain a seven out of ten.  *Id*.  Plaintiff indicates that his numbness and tingling causes difficulty with grasping.  *Id*.  Plaintiff gets about two hours of

sleep each night and alternates sleeping between the recliner and couch.  (PageID.216).  When Plaintiff reaches with his right arm, he gets dizzy due to his shoulder pain.  *Id*.

Plaintiff's mother, Pauline Frans, testified. (PageID.217).  Plaintiff mostly lies in the recliner and naps.  (PageID.219).  He appears to be in a lot of pain and has a hard time maneuvering or twisting due to fear that his back will give out.  *Id*.  Plaintiff gets help with household chores from his sister.  He cannot walk very far and only grocery shops for five to ten minutes before returning to the car.  (PageID.220).

Medical expert Dr. Oguejiofor testified regarding his opinion of Plaintiff's condition. (PageID.222).

> A. Judge, I think we have to, we have to go system by system, starting with the musculoskeletal system, we have a history of a motor vehicle accident in 1996. And he has been having neck and shoulder and back pains. We have multiple radiological evaluations in the form of MRI studies, x-rays. For example on 7F, Page 1 is an MRI of the lumbar spine from September 2010 showing degenerative changes at L3-L4 and L4-L5. We also have on 12F, Pages 6 to 7, MRI of the cervical spine from 2010 showing moderate degenerative changes from C4 to C5, C5 to C6, C6 to C7 with no evidence of myelopathy, meaning no evidence for spinal cord compromise. Thus his pains have continued over the years, and ultimately looking at Exhibit 29F by September 2015, he underwent L4-L5 microdiscectomy for lumbar radiculopathy. Looking at 29F, Page 7 postoperatively on follow up the surgeons, it is documented that he had done well with his surgery. H[is] pain had improved. No neurological deficits on examination. On 20F, Pages 23 and 24 is an EMG study of the upper limbs showing no evidence of radiculopathy or nerve compromise. So Judge, with regards to the musculoskeletal system, we will be looking at listing 1.04, which he does not meet. Number 2, we can look at the respiratory system or pulmonary, looking at Exhibit BF, he was admitted into the hospital with suspected pneumonia, weight loss and some abnormalities on the chest x-ray lymphadenopathy or swollen lymph nodes. He was suspected of having sarcoidosis, but really do not have any objective proof of sarcoidosis, and the way that is done is in the form of a biopsy showing (INAUDIBLE) in the lungs but we don't have that evidence. In any case he had a normal pulmonary function studies and there are several in the file, Your Honor. Therefore, with regards

4

to the lungs, we're looking at these in (INAUBILE), which he [does not meet]. . . .

A. Number 3, we look at the gastrointestinal system. Looking at Exhibit llF, Page 3. He is said to have a positive blood test for Hepatitis C. The record does not show the presence of liver failure or liver cirrhosis. And the record does not show at this time that he has received any treatment for Hepatitis C.  Looking at Exhibit 19F, specially Page 4, he has evidence on endoscopy ulcer of the esophagus, and (INAUDIBLE), Your Honor.  So because of these he cannot take nonsteroidal, anti-inflammatory pain medications, like Ibuprofen, because this will exacerbate stomach ulcers, and he suffers those ulcers. The main things I looked at on that gastrointestinal system are 5.05, that deals with chronic liver disease, he would not meet that listing, Your Honor. The record also shows that he has been treated for other physical problems, migraine headaches. He has had cardiology evaluation, for example on 14F, Page 7, regarding normal (INAUDIBLE) cardiogram on 14F, Page 23. He had a cardiac stress test, which he did not do very well with, with no explanations why. But that was followed up by a chemical stress test on 14F, Page 24, which did not show any evidence of a coronary ischemia, Your Honor. So there are really no cardiovascular listings that would apply in this situation. However, I do see on Exhibit 20F records from another physician given the (INAUDIBLE) diagnosis of fibromyalgia. But I don't see any consistent description of the typical trigger points that you would have for fibromyalgia. In any case, we do have objective reasoning why he has the pains, which is degenerative disc disease of the cervical spine and the lumbar spine. So, Your Honor, overall he does not meet or equal any listings that I have already mentioned. And in terms of functionality, I believe if I put all his typical problems together, that he would be able to function at a light level. I will avoid ropes, ladders and scaffolds, all his postural would be occasionally, Your Honor. That's what I have on the vocational side. There are mental issues in the file, anxiety, attention deficit, hyperactivity disorder but that is not my territory.

Q.  Okay. So other than with the occasional posturals and no ropes, ladders, scaffolds, working at elevated levels, he would be able to do the full range of light work in terms of lifting, standing, walking, all of that, correct?

A. Yes, Your Honor, from a physical point, yes, Judge.

(PageID.222-224).  Dr. Oguejiofor indicated that his opinion is based upon the objective medical evidence, Plaintiff's subjective complaints, and all the tests and examinations in the medical record.  (PageID.225).

Vocational expert Joseph Entwistle testified that Plaintiff's past work was as a construction worker which is considered at the heavy exertional level. (PageID.231).  Plaintiff could not perform his past work.  *Id.* A hypothetical individual limited to light work with occasional climbing without ropes, ladders, scaffolds, or elevated levels, with allowance of occasional stooping, kneeling, crawling, balancing, and crouching could perform work at the light and sedentary levels in jobs such as parking lot attendant (75,3000 jobs), food prep worker (137,800 jobs), credit checker (14,800 jobs), or office clerk (90,200 jobs). (PageID.231-232). Limitations that include no concentrated exposure to vibrations, fumes, dust, environmental irritants, or overhead reaching would not preclude these jobs.  (PageID.232-233). If the individual could use hands on a frequent but inconsistent basis, these jobs are available.  (PageID.233). Limitations that require simple routine, but not complex tasks would not foreclose these jobs.  *Id.* If the individual needed to alternate between sitting and standing, the food preparation jobs would be eliminated.  *Id.*     An individual may be off task ten percent of the time in these jobs, but if it increased to fifteen percent of the time, that individual may not be employable.  (PageID.234). Missing work once or twice per month is acceptable when infrequent and not consistent every month. *Id.*

The ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy given Plaintiff's residual functional capacity (RFC) and therefore concluded that Plaintiff was not under a "disability" under the Social Security Act (20 C.F.R. §

404.1520(g)).  Plaintiff now seeks judicial review of the agency's final decision denying his request for disability benefits.

"[R]eview of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Winslow v. Comm'r of Soc. Sec.*, 566 Fed. Appx 418, 420 (6th Cir. 2014) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); *see also* 42 U.S.C. § 405(g).  The findings of the ALJ are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  *Jones v. Sec'y, Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991).  This Court is not permitted to try the case *de novo*, nor resolve conflicts in the evidence and cannot decide questions of credibility.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (noting the ALJ's decision cannot be overturned if sufficient evidence supports the decision regardless of whether evidence also supports a contradictory conclusion).  This Court is required to examine the administrative record as a whole and affirm the Commissioner's decision if it is supported by substantial evidence, even if this Court would have decided the matter differently.  *See Kinsella v. Schwikers*, 708 F.2d 1058, 1059 (6th Cir. 1983); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (holding that the court must affirm a Commissioner even if substantial evidence would support the opposite conclusion).

The ALJ must employ a five-step sequential analysis to determine whether the claimant is disabled as defined by the Social Security Act.  See 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f); *Warner v. Comm'r of Soc. Sec*., 375 F.3d 387, 390 (6th Cir. 2004).  At step one, the

ALJ determines whether the claimant can still perform substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  At step two, the ALJ determines whether the claimant's impairments are considered "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  At step three, the ALJ determines whether the claimant's impairments meet or equal a listing in 20 C.F.R. part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii).  At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to still perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  At step five, after considering the claimant's residual functional capacity, age, education, and work experience, the ALJ determines whether a significant number of other jobs exist in the national economy that the claimant can perform.  20 C.F.R. § 404.1520(a)(4)(v).  If the ALJ determines the claimant is not disabled under any step, the analysis ceases and the claimant is declared as such.  20 C.F.R § 404.1520(a).  If the ALJ can make a dispositive finding at any point in the review, no further finding is required.  20 C.F.R. § 404.1520(a).

Plaintiff has the burden of proving the existence and severity of limitations caused by his impairments and that he is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

The ALJ determined that Plaintiff has the severe impairments of degenerative disc disease, headaches, and fibromyalgia and mild impairments including gastroesophageal reflux disease, hypertension, hyperlipidemia, hepatitis C, carpal tunnel syndrome, suspected sarcoidosis, and anxiety.  The ALJ found that although Plaintiff could not perform his past relevant work, he

could perform light work with some limitations.  The ALJ found that Plaintiff could perform a significant number of jobs in the national economy and concluded that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following limitations: occasional climbing, except no climbing ladders, ropes, or scaffolds: no work at heights; occasional stooping, crouching, kneeling, balancing, and crawling; no overhead reaching.

(ECF No. 7-3, PageID.182).  The ALJ concluded that Plaintiff had the residual functional capacity to perform light work with limitations that allowed him to work in occupations such as parking attendant (75,300 jobs in the national economy) and food preparation worker (137,800 jobs in the national economy).  The ALJ described these jobs as unskilled. Additionally, the ALJ concluded that Plaintiff could perform work at the sedentary level in jobs such as credit checker (14,800 jobs in the national economy) and general office clerk (90,200 jobs in the national economy). (PageID.191). Petitioner argues that the ALJ erred by finding that Plaintiff had the RFC to work. Petitioner argues that the ALJ failed to fully consider the impact of Plaintiff's pain symptoms on his ability to function daily, the ALJ erred in evaluating the medical opinion evidence, and the ALJ erred by relying on the VE testimony.

Plaintiff argues that the RFC determination is not supported by substantial evidence in the record. In determining a person's RFC, an ALJ should assess the person's "ability to do sustained work-related physical and mental activities in a work setting" for eight hours a day, five days a week, or an equivalent work schedule. SSR 96-8p. An impairment is severe for purposes of an RFC determination when it is a "'medically determinable' physical or mental impairment or a combination of impairments that significantly limit(s) an individual's physical or mental ability to perform basic work activities." *White v. Colvin*, No. 14-CV-12870, 2015 WL 5210243, at *6 (E.D.

Mich. Sept. 3, 2015) (citing 20 C.F.R. §§ 416.920(a)(4)(ii) and 416.920(c)).  The regulations state that basic work activities include:

> 1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handline; 2) capacities for seeing, hearing, and speaking; 3) understanding, carrying out, and remembering simple instructions; 4) use of judgment; 5) responding appropriately to supervision, co-workers, and usual work situations; and 6) dealing with changes in a routine work setting.

*White*, 2015 WL 5210243, at *6 (citing 20 C.F.R. § 416.921(b)). Notably, an RFC is not the least a person can do, but the most a person can do despite his limitations or restrictions. SSR 96-8p. Plaintiff bears the burden of providing the medical evidence showing the severity of his conditions. *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

In making an RFC finding, "[i]t is well established that the ALJ may not substitute his medical judgment for that of the claimant's physicians."  *Brown v. Comm'r of Soc. Sec.*, No. 1:14-CV-236, 2015 WL 1431521, *7 (W.D. Mich. Mar. 27, 2015) (citing *Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006)); *see Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Charter*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). However, the ALJ is not required to base his or her RFC findings entirely on a physician's opinion. *See Rudd v. Comm'r of Soc. Sec.*, 531 Fed. App'x 719, 728 (6th Cir. 2013) (quoting SSR-96-5p) ("[T]o require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'"); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) ("[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional

capacity finding."). Ultimately, the ALJ may base her RFC finding on *all* relevant evidence on record, including an individual's medical history, reports of daily activity, and recorded observations, for example.  SSR 96-8p, 1996 WL 374184, at *5.  The "ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and nonmedical evidence." *Rudd*, 531 Fed. App'x at 728.

Plaintiff asserts that the ALJ failed to fully evaluate his subjective complaints of pain.  The ALJ found that the objective medical evidence did not support Plaintiff's claims of disabling pain.  The ALJ noted:

> The claimant's medical records also reflect that despite ongoing symptoms related to degenerative disc disease and fibromyalgia, he has retained reasonable physical function. For example, when consultative physician Tama Abel, MD examined the claimant in December 2009, the claimant complained of pain and exhibited decreased range of motion of the cervical spine, lumbar spine, shoulders, hips, and left knee. He also complained of pain upon straight leg raising and he exhibited tenderness to palpation of the paraspinous muscles between the shoulders to the sacrum. However, the examination otherwise showed no evidence of any joint laxity, crepitus, or effusion. The claimant was able to make a full grip bilaterally with adequate grasping and unimpaired dexterity. He also exhibited only mild difficulty with squatting and otherwise had no difficulty getting on and off the examining table and no difficulty with heel and toe walking. He exhibited only mild difficulty hopping on the right and would not attempt to hop on the left. A neurological examination was also essentially normal, as findings included intact sensation, negative Romberg testing, and normal motor strength and tone. Dr. Abel indicated that the claimant walked with only a somewhat antalgic gait, but he concluded the claimant's gait was overall normal and that he did not use any ambulatory aids. Moreover, Dr. Abel noted that the claimant's gait was less antalgic "as he left the examination area." Dr. Abel also noted that, although the claimant initially presented as holding his neck "rather stiffly," he had no difficulty putting on his long-sleeved shirt and jacket at the end of the examination. Dr. Abel further noted that the claimant appeared to "hold his neck less stiffly" as he walked towards the elevators (Exhibit 4F, pages 3-6).

Physical medicine and rehabilitation physician Richard Rovin, MD evaluated the claimant in February 2014, and an examination at that time showed only interscapular trigger points. Dr. Rovin recommended a non-operative approach, but in October 2014, the claimant reported no significant benefit from this plan of care (Exhibit 23F, pages 3-4).

However, the claimant has reported some improvement in symptoms with prescription medication, and has declined other recommended treatment options. For example, the claimant presented to neurosurgeon Richard Vermeulen, MD for an evaluation in May 2014. An examination at that time was essentially normal, as findings included no tenderness, full muscle strength in all extremities, symmetric deep tendon reflexes, pain-free and full range of motion of the extremities, and a normal gait. Dr. Vermeulen recommended only physical therapy and expressly indicated that he would not recommend surgery (Exhibit 22F, pages 3-9). In June 2014, the claimant told Vermeulen that prescription pain medication "takes care of" his pain (Exhibit 22F, page 3).

After some difficulty with insurance, claimant eventually began pain management at the Escanaba Pain Office in October 2014, and he received treatment in the form of pain medication and facet joint injections. According to these records, physical examinations generally showed only some thoracic spine tenderness, positive trigger points at the lumbar paraspinals, and decreased range of motion of the lumbar spine. John Birgiolas, MD documented no positive trigger points on some occasions, as well as only slightly decreased (4+/5) grip strength on the right, and only on one occasion in October 2014. Dr. Birgiolas otherwise documented no muscle spasms, full muscle strength in all extremities, normal muscle tone, intact sensation, and symmetric deep tendon reflexes. He noted only a mildly to moderately antalgic gait on a few occasions, and on many other occasions the claimant exhibited normal gait and station (Exhibits 20F, 31F). Notably, in February 2015, the claimant said he was sleeping better at night and was functionally improved" with medication (Exhibit 20F, page 7). At visits in February and March 2015, he described his usual pain level as only a 5 on a scale of 1 to 10 (10 being "worst pain"). He described his functional impairment as only moderate in severity, and he said that, although his pain regularly interfered with his sleep, it only interfered with some daily activities (Exhibit 20F, pages 2, 5). Although he reported an increased subjective pain level for a few months thereafter, shortly following lumbar spine surgery in September 2015 (see discussion below), he began reporting an overall pain level of only 6 to 7 out of 10. Further, John Birgiolas, MD documented no significant

examination abnormalities, other than some subjective complaints of tenderness and decreased sensation in the right leg and a mildly antalgic gait (Exhibit 31F pages 40-51).

Claimant sought a second opinion from neurosurgeon Sonia Geschwindt, MD in September 2015. The claimant complained of some numbness in the left lower extremity, but the examination was otherwise normal and showed full strength in all muscle groups of all extremities, normal reflexes, and a normal tandem gait. Nevertheless, Dr. Geschwindt offered surgery for his lower extremity complaints (Exhibit 27F, pages 3-6; see also duplicates at 29F). Dr. Geschwindt subsequently performed a left L4-5 microdiscectomy on September 22, 2015 (Exhibit 29F, pages 5, 9). The claimant initially did well following this procedure, although he reported an increase in his pain after a fall in December 2015 (Exhibit 29F, page 9). He participated in physical therapy, and as of April 2016, he reported only some ongoing back discomfort (Exhibit 29F, page 14).

His primary concern at the April 2016 visit with Dr. Geschwindt was neck pain and headaches, which he said developed after physical therapy. However, although the claimant complained of some numbness in two of his fingers, Dr. Geschwindt documented no weakness in any of the muscle groups of the upper or lower extremities. She also confirmed that recent MRI imaging showed only "very mild" degenerative disc disease with no evidence of any spinal cord or nerve compression (Exhibit 29F, page 14). Further, the record contains no documentation of emergency room visits or objective diagnostic studies to confirm the severity and frequency of the headaches he asserts.

Finally, the claimant's treatment records suggest that the claimant may have overstated the severity or frequency of his symptoms. Specifically as to low back pain, the claimant's primary care provider noted that, despite having been seen at their clinic since at least 2007, there was no indication that the claimant had previously sought treatment related to low back pain prior to September 2010. The physician expressly noted the claimant's statement that "one of his objectives is to seek disability for this problem." This provider noted that the claimant got onto the examination table without assistance and exhibited full muscle strength, a negative straight leg raise to 90 degrees, and no evidence of muscle atrophy or report of lower extremity numbness (Exhibit 10F, page 6). While the treating provider recommended physical therapy, the claimant declined, first due to a lack of insurance and, once insured, due to a preference for seeing a specialist (Exhibit 10F). Notably, the claimant reported

intermittent back pain, which is not consistent with reports of constant debilitating pain (Exhibit 10F). Similarly, when seeking emergency treatment for back pain following a fall in April 2011, the claimant reported that his back only intermittently went out on him. At that time, the claimant's pain improved significantly with prescription pain medication (Exhibit 14F, page 49). Further, in June 2014, Dr. Vermeulen expressly noted that while the claimant emphasized that he "cannot do anything" due to back pain, he was able to walk in a normal fashion, without evidence of weakness, and had normal lower extremity range of motion (Exhibit 22F, page 3). The consistent clinical findings as to the claimant's normal strength and muscle tone suggest that his pain has not altered his use of those muscles to an extent that has resulted in atrophy.

(ECF No. 7-3, PageID.185-187).

The Sixth Circuit has long recognized that "pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984); *see also Greco v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir. 2002). Nevertheless, "[a] subjective allegation of disabling symptoms alone is insufficient; the claimant must substantiate the symptoms by objective clinical or lab findings." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 498 (6th Cir. 2006).

The mere existence of an impairment, even a severe one, will not entitle Plaintiff to disability benefits unless the impairment prevents him from returning to past work or any other substantial gainful activity existing in the national economy considering his age, education and work experience. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505. A claimant's subjective allegations of disabling symptoms are insufficient by themselves to support a claim for benefits, *see Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001), *Sizemore v. Secretary of Health and Human Services,* 865 F.2d 709, 713 (6th Cir.1988), and the symptoms must be substantiated by some objective clinical or laboratory findings. *Hurst v. Secretary of Health and Human Services,*

753 F.2d 517, 519 (6th Cir.1985); *see also* 20 C.F.R. §§ 404.1529 and 416.929; Social Security Ruling (SSR) 96-7p.

      The ALJ's assessment of a claimant's symptoms is entitled to great weight and deference, since the ALJ had the opportunity to observe the witness's demeanor. *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). Nevertheless, the ALJ's assessment of a claimant's subjective symptoms "must be reasonable and supported by substantial evidence in the record." *Rogers*, 486 F.3d at 249. In addition, it the claimant's burden to prove the severity of the alleged impairments, the mere diagnosis of a medical condition "says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). The ALJ must assess an individual's pain symptoms by using a two prong test:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Id.* (referencing *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (quoting *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)); *see also* 20 C.F.R. § 404.1529(a). An ALJ can also consider an individual's ability to do household and social activities when assessing pain allegations and disabling symptoms. *Walters*, 127 F.3d at 532. The ALJ specifically discounted Plaintiff's complaints of pain by explaining:

> The claimant's description of daily activities is inconsistent with his complaints of disabling symptoms and limitations. He had apparently been inflating the tire on a trailer in July 2012 (Exhibit l 7F, page 9). As noted above, the claimant has lived independently throughout much of the record, and although he testified in February

2017 that he was living with his mother, his mother said this was because her husband had recently died and she did not want to be alone. He otherwise said he is able to tend to his personal care and has reported tending to all household chores, albeit he reported more recently that he received some assistance from his sister. The claimant has reported preparing simple meals daily, and shopping for groceries once per week. The claimant reported leaving his home daily, and being able to do so independently. He reported spending time watching television, talking on the phone, visiting with family, and attending social events (Exhibit 3E; Testimony). In sum, these activities demonstrate that, despite experiencing symptoms of degenerative disc disease, fibromyalgia, and headaches, the claimant has remained able to engage in a number of normal day-to-day activities, many of which involve at least a light level of exertion. Such evidence further supports a finding that the claimant remains capable of performing work involving the reduced range of light exertion described above.  Further, the claimant has reported at least a ten-year history of constant back and neck pain; however, the record documents that the claimant worked in heavy exertional occupations until he was laid off in 2008 (Exhibits 12E; 22F, page 5). The fact that the claimant's neck and back pain did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work with the residual functional capacity finding herein. For these reasons, and for the other reasons discussed above, the undersigned finds that the claimant's complaints of disabling symptoms are not fully supported by the record.

(ECF No. 7-3, PageID.187-188).

The ALJ set forth specific reasons in support of her conclusion that Plaintiff's pain symptoms were not disabling. The ALJ acknowledged Plaintiff's claims of constant pain and his presentation of these symptoms to medical providers.  In addition to finding that Plaintiff has the severe impairments of degenerative back disease and headaches, the ALJ found that Plaintiff has the severe impairment of fibromyalgia.  For example, Dr. Able noted, after the December 4, 2009 consultative exam, that Plaintiff was independent with his activities of daily living, but that some days were harder than others. (ECF No. 7-15, PageID.886).  Plaintiff's back pain was due to musculoskeletal and degenerative disc disease, and his neck pain was primarily musculoskeletal.

(PageID.889-890).  Plaintiff walked with a normal gait without assistance, was less antalgic as he left the examination room, and held his neck less stiffly as he walked toward the elevators. (PageID.887, 889).  After Plaintiff twisted his back moving a recliner in September of 2010, he was treated with pain medications with some success.  (PageID.911).  A September 15, 2010, MRI showed degenerative disc changes at L3-4 and a developmentally narrowed L5-S1 disc, minimal canal stenosis at L3-4 and L4-5 and minimal neuroforaminal encroachment at L4-5.  (PageID.904). A December 17, 2010, thoracic spine study showed unremarkable results and MRI showed moderate degenerative disc space disease. (PageID.968-970).

Plaintiff presented at the Schoolcraft Memorial Hospital emergency room with severe back pain after slipping on the floor in April of 2011.  (ECF No. 7-18, PageID.1023). Plaintiff has prior episodes of his back giving out.  Plaintiff was able to walk more easily after pain medication was administered.  *Id*.  Plaintiff underwent a sleep study on December 14, 2011, due to falling "asleep in non-stimulating circumstances." (ECF No. 7-17, PageID.985).  Plaintiff stated that it is difficult to sleep due to his constant back and neck pain.  Plaintiff reported that he usually falls asleep around midnight and wakes around 6 a.m.  Plaintiff was observed for 423 minutes and slept for 352 minutes during that time period.   It took Plaintiff about 32 minutes to fall asleep. His sleep was normal until the last 30 minutes of wakefulness.  *Id*.

Plaintiff presented at the emergency room with a neck strain on January 23, 2013. A CT examination showed mild, early degenerative disc changes with facet arthritis, no evidence of acute fracture or dislocation.  (ECF No. 7-19, PageID.1082-1083).  Doctor Richard A. Rovin evaluated Plaintiff for ongoing back pain and noted that Plaintiff experiences baseline pain that sometimes gets worse.  (PageID.1160).  Dr. Rovin recommended physical therapy and a visit to an interventional pain clinic.  Dr. Richard E. Vermeulen, examined Plaintiff on June 27, 2014, and

17

agreed with Dr. Rovin's assessment.  (PageID.1150-1151). Plaintiff was examined by Dr. Jordan M. Povich in January and March of 2014.  (ECF No. 7-20, PageID.1195-1198, 1207-1210).  Dr. Povich recommended that Plaintiff follow the treatment plan of physical therapy, physical medicine and rehabilitation, and interventional pain diagnostics. (PageID.1195).  In September of 2014, Plaintiff complained of back pain with a duration of 20 years and requested neurosurgery. Dr. Povich recommended that Plaintiff go to a multidisciplinary pain management program and noted that Plaintiff was not interested in that recommendation.  (PageID.1189-1190).

Dr. Sonia Geschwindt examined Plaintiff on September 1, 2015.  (PageID.1249-1251).  Dr. Geschwindt stated that disc herniation explained Plaintiff's lower extremity radiculopathy but noted that the cause of his back pain was more difficult to determine. She recommended a microdiscectomy with resection of disc if Plaintiff felt he had exhausted conservative treatment options but stressed that this would only correct his radiculopathy and not his back pain which would require further conservative treatment.  (PageID.1251).  After the microdiscectomy, Plaintiff reported "much improvement in pain" in his left lower extremity with no numbness, weakness, or tingling.  (PageID.1273).  Plaintiff suffered a fall in January of 2016 and complained of back pain going down to his leg.  (PageID.1279).  Dr. Geschwindt recommended that Plaintiff return to physical therapy with only a restriction on heavy lifting.  *Id*. Dr. Geschwindt examined Plaintiff in April of 2016, for complaints of neck pain.  She noted that Plaintiff does not have weakness in any muscle groups and "has very mild degenerative disc disease without any evidence of spinal cord or nerve compression."  (PageID.1282).  Dr. Geschwindt was uncertain as to the etiology of Plaintiff's pain symptoms.  *Id*.

In the opinion of the undersigned, the ALJ's finding that Plaintiff's pain symptoms were not supported by objective evidence is supported by substantial evidence in the record. The

18

ALJ's assessment of Plaintiff's allegations of disabling symptoms was thorough and complete. The ALJ properly concluded that Plaintiff's allegations were inconsistent with the medical evidence. *See, e.g.*, *Winslow*, 566 Fed. Appx at 422 (demonstrating that the ALJ found claimant's alleged functional limitations not credible because it largely conflicted with creditable objective medical evidence). In the addition, the ALJ reasonably relied on the opinion of medical expert Dr. Oguejiofor in establishing Plaintiff's RFC and determining that Plaintiff was not disabled.

Plaintiff argues that the ALJ erred in her evaluation of Dr. Oguejiofor's opinion by giving it significant weight and erred by giving only little weight to Dr. Wojewnick's opinion. The ALJ explained:

> As for the opinion evidence, medical expert Dr. Oguejiofor testified at the February 2017 hearing. Dr. Oguejiofor offered his opinion that the claimant's condition did not meet or equal the requirements of any listed impairment. Dr. Oguejiofor offered his opinion that the claimant was capable of performing a reduced range of light work. According to Dr. Oguejiofor, the claimant was limited to performing light exertion with no climbing of ropes, ladders, and scaffolds. He also opined the claimant could only occasionally perform postural activities.
>
> The undersigned gives significant weight to the opinion of Dr. Oguejiofor. He is an impartial medical expert who had the opportunity to review the entire record, other than the post-hearing report from Dr. Wojewnik, but Dr. Wojewnik did not examine the claimant and thus did not provide any additional findings which would have assisted Dr. Oguejiofor in assessing the claimant's functioning. Although Dr. Oguejiofor is an internist and not a specialist in any specific area at issue in this case, he provided a detailed explanation of the medical evidence he used in arriving at his opinion, and his impartial testimony was well-reasoned and persuasive. Dr. Oguejiofor's opinion is generally consistent with objective signs and findings in the preponderance of the record, and thus the undersigned has adopted his limitations for a reduced range of light work. However, in consideration of the claimant's more recent complaints of neck pain and headaches, which he attributed to post-surgical physical therapy, the undersigned has further limited him to no overhead reaching. No further limitations are warranted regarding the upper extremities, as examination findings

have essentially been normal and showed full strength and intact sensation. No treating physician has provided an opinion to the contrary that the claimant is "disabled" or more limited than set forth above.

As indicated above, the claimant's representative submitted a post-hearing report from Dr. Wojewnik, an orthopedic spine surgeon who reviewed the claimant's records and provided a narrative summary of his assessment March 2017. Dr. Wojewnik also completed a physical capacities assessment form, and he offered his opinion that the claimant could lift and/or carry no more than 10 pounds and that he could sit, stand, and/or walk no more than 15 minutes at a time or for a total of less than two hours each in an eight-hour workday. Dr. Wojewnik also opined that the claimant needed to shift positions at will, include periods of walking every 15 minutes, and take unscheduled breaks every 15 to 30 minutes throughout the day. He indicated several postural limitations, and he opined that the claimant could use his arms, hands, and fingers no more than 10% of the workday. According to Dr. Wojewnik, the claimant's pain would constantly interfere with attention and concentration, and he was incapable of even "low stress" jobs. He further opined that the claimant would likely miss work at least four times per month (Exhibit 32F).

Dr. Wojewnik did not examine the claimant and is therefore not a "treating" or examining source as defined in 20 CFR 404.1502 and 416.902. The undersigned gives little weight to his opinion pursuant to 20 CFR 404.1527(e) and 416.927(d). Although Dr. Wojewnik is an orthopedic spine surgeon, unlike Dr. Oguejiofor, there is no evidence he is trained in or familiar with the Social Security regulations for determining disability. Moreover, his opinion is out of proportion with the preponderance of the medical evidence, including the medical evidence he cited to in his narrative report. As discussed above, the cervical spine pathology was generally only mild to moderate in severity. Lumbar spine pathology was only moderate in severity and improved with surgery. Physical examinations have generally shown only some tenderness, decreased range of motion, spasms, decreased sensation, and positive straight leg raising, and only on some occasions. Many other examination findings were relatively normal, and although he walked with an antalgic gait on some occasions, he walked with a normal gait on many other occasions. These findings, and the other findings discussed above, are more than adequately accounted for by the limitations above for a reduced range of light work. The undersigned also gives little weight to Dr. Wojewnik's opinion that the claimant could use his arms, hands, and fingers no more than

10% of the workday. As discussed above, an EMG and nerve conduction study in December 2014 was normal, and examinations of the upper extremities have generally shown no more than slightly decreased (4+/5 strength) and subjectively decreased sensation, with many other upper extremity findings completely normal. Dr. Wojewnik's opinion regarding the ability to concentrate and tolerate stress is also out of proportion with the records. Although the claimant alleged drowsiness due to his medications, as discussed above, numerous mental status examinations in the record were completely normal and showed intact concentration and memory. For all of these reasons, the undersigned gives little weight to the opinion of Dr. Wojewnik.

(ECF No. 7-3, PageID.188-189).

Under the regulations, an ALJ must weigh all medical opinions regardless of its source. 20 C.F.R. § 1527(c). A medical opinion is considered with all the other evidence presented. 20 C.F.R. § 1527(b). The ALJ gives greater weight to opinions from a medical professional who can articulate medical support in the record consistent with the entire record. 20 C.F.R. § 1527(c)(3) and (4). In general, greater weight is given to the medical opinion of a specialist in the field. 20 C.F.R. 1527(c)(5). Moreover, an ALJ is not required to rely on medical opinions concluding that a person is, or is not, disabled since that is an issue reserved to the Commissioner. 20 C.F.R. § 1527(d).

The ALJ explained that Plaintiff's expert witness, Dr. Wojewnick, is an orthopedic spine surgeon and that medical expert, Dr. Oguejiofor, is an internist. Nevertheless, the ALJ was entitled to accept Dr. Oguejiofor's opinion and give it greater weight because it was consistent with the medical record on the whole. While, Plaintiff asserts that Dr. Wojewnick based his findings on records that Dr. Oguijiofor did not have, the ALJ considered Plaintiff's neck limitations and headaches when making Plaintiff's RFC by prohibiting overhead reaching. The ALJ correctly found that the medical records showed only mild to moderate spine pathology. The RFC took into account each of Plaintiff's physical limitations. In the opinion of the undersigned,

21

the medical record supports the ALJ's determination that Dr. Oguejiofor's medical opinion was entitled to significant weight and Dr. Wojewnick's opinion was entitled to little weight. Substantial evidence supports the ALJ's RFC finding based upon the entire record, which provides support for Dr. Oguejiofor's medical opinion.

Plaintiff argues that the VE's testimony provided improper job numbers for each representative job category, because he relied on categories of jobs rather than specific jobs identified in the Dictionary of Occupational Titles (DOT). The VE provided codes assigned by the DOT and testified regarding the number of jobs based upon the Bureau of Labor Statistics' Standard Occupational Classification (SOC). Plaintiff argues that it was error for the ALJ to rely on the VE's testimony because the SOC provides information regarding occupational groups that included additional DOT codes of jobs, that might not actually fit the ALJ's RFC analysis.

The ALJ has a duty under SSR 00-4p to ask the VE expert whether the testimony conflicts with the information provided in the Dictionary of Occupational Titles. *Lindsley v. Comm'r of Soc. Sec.,* 560 F.3d 601, 603 (6th Cir. 2009). The "ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry specified by SSR 00-4p." *Saunders v. Comm'r of Soc. Sec.*, 2010 WL 1132286 (W.D. Mich. 2010) (citing *Lindsley* 56- F.3d at 606). It is Plaintiff's representative's duty to raise any conflicts in the vocational expert's testimony and the Dictionary of Occupational Titles. See *Saunders* and *Johnson* v. *Comm'r of Soc. Sec.*, 2013 WL 1703894 (W.D. Mich. 2013) (where counsel fails to bring to the ALJ's attention discrepancies or conflicts with the Dictionary of Occupational Titles, it is too late to seek relief in federal court on such a ground). The Dictionary of Occupational Titles refers to the "collective description" of jobs and each description "refers to a grouping of numerous individual jobs with similar duties. *Lindsley,* 560 F.3d at 605. Plaintiff must show that he was unable to

perform each of the jobs of the representative occupations.  *Martin v. Comm'r of Soc. Sec.*, 170 Fed. Appx. 369, 374 (6th Cir. 2006) ("Furthermore, even if the two positions about which there were inconsistencies had been excluded, the ALJ still could have reasonably found that Martin could perform the third position as assembler."); *Joyce v. Comm'r of Soc. Sec.*, 662 Fed. Appx. 430, 437 (6th Cir. 2016).

Plaintiff's counsel questioned the VE about his use of the SOC job grouping.  (ECF No. 7-3, PageID.236-240).  The VE indicated that he used data available within the SOC clusters to determine which job groupings fit the RFC and then reduced the job numbers to further reflect those limitations.  (PageID.236).  This court rejected a similar argument explaining in part:

> The Fourth Circuit's decision in *Guiton v. Colvin*, 546 Fed. Appx. 137 (4th Cir., Nov. 7, 2013), is both instructive and persuasive. In that case, the court faced the same issue advanced by Plaintiff, a vocational expert relied on the DOT to identify jobs which a claimant could perform consistent with his RFC, but relied on a different, more inclusive, source to estimate the number of such jobs which existed. *Id.* at 140-43. As the court recognized, "there is apparently no data, updated on a regular basis, available through either a public or private source, that reports numbers of jobs by DOT code number." *Id.* at 142. As the court further recognized:
>
>> if we required a VE to produce job statistics specific to the DOT-coded occupations a claimant can perform, it is unlikely that the Commissioner would *ever* succeed in satisfying her burden. This cannot be the result the regulations intend. Indeed, that the data Guiton requests does not exist "is a sign that [Guiton] expects too much," and like the Seventh Circuit, we decline to "impose impossible burdens on the VE."
>>
>> In this case, the VE cited the existence of 26,330 jobs in North Carolina and 825,000 jobs in the United States that Guiton could perform. Even assuming these numbers were overinclusive, far smaller figures would still suffice to satisfy the Commissioner's burden. We hold that the job numbers the VE provided, although perhaps

23

> somewhat imprecise, were sufficiently reliable to support the ALJ's conclusion.
>
> *Id.* at 142-43 (internal citations omitted).
>
> The Court first notes that while Plaintiff, by way of the vocational expert's testimony, has established that the DOT codes does not contain specific jobs numbers and that instead VE's rely on a variety of sources, Plaintiff has presented no evidence that there exists a relevant or appreciable difference in the number of jobs which exist under the DOT and the sources the VE relied on. Moreover, even if the Court assumes an appreciable dissymmetry, Plaintiff still falls short. As noted above, the vocational expert testified in this matter that there existed approximately 183,000 in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. While this estimation may be somewhat imprecise, Plaintiff has failed to demonstrate that such imprecision either calls into question the ALJ's reliance on the vocational expert's testimony or results in a less than significant number of jobs which she can perform consistent with her RFC. Thus, the Court finds no error in the fact that the vocational expert relied on the DOT to identify jobs which Plaintiff could perform and relied on other public sources to estimate how many such jobs existed.

*Gebbia v. Comm'r of Soc. Sec.*, 1:16-cv-802 (W.D. Mich. July 18, 2017) (PageID.1265-1266). Plaintiff further questions whether he could perform the credit checker positions based upon the RFC adopted by the ALJ. Even if the court were to exclude the credit checker jobs from consideration, the VE identified over 300,000 other positions in the national economy that an individual with Plaintiff's RFC could perform. In the opinion of the undersigned, the ALJ properly relied upon the VE's testimony and Plaintiff has failed to show that remand is necessary. In the opinion of the undersigned, there is substantial evidence in the record that supports the Commissioner's decision that Plaintiff is not disabled as defined by the Social Security Administration.

In light of the foregoing, the undersigned recommends that the decision of the Commissioner be AFFIRMED and Plaintiff's request for relief be DENIED.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  February 11, 2019